**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| RONALD S. BEAR AND CHELEA BEAR,<br><br>Plaintiff,<br>v.<br><br>NOVO NORDISK INC., NOVO NORDISK A/S,<br><br>Defendants. | COMPLAINT & JURY DEMAND<br><br>CIVIL ACTION NO: 2:26-cv-7399 |

**COMPLAINT AND JURY DEMAND**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, and privileges, and obligations of the Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Tennessee as Plaintiff's venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_X_ Plaintiff currently resides in Sweetwater, Tennessee.

_X_ Plaintiff purchased and used Defendant(s)' products in Sweetwater, Tennessee.

___ The Original Venue is a judicial district in which Defendants Novo Nordisk Inc. and

Novo Nordisk A/s reside, and all Defendants are residents of the State in which the district is located (28 U.S.C. § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 U.S.C. § 1391(b)(2)): Eastern District of Tennessee.

___ There is no district in which an action may otherwise be brought under 28 U.S.C. § 1391, and the Original Venue is a judicial district in which Defendants Novo Nordisk Inc. and Novo Nordisk A/S are subject to the Court's personal jurisdiction with respect to this action (28 U.S.C. § 1391(b)(3)).

__ Other reason (please explain): ______________________________________________.

COMES NOW, Plaintiff, RONALD BEAR, by and through the undersigned counsel, and brings this complaint against Defendant Novo Nordisk Inc. and Novo Nordisk A/S (hereinafter "Defendants" or "Novo Nordisk"), for damages suffered by Mr. Bear who was severely injured as a result of Defendants' widespread marketing of its drug, Rybelsus, and his subsequent use of Rybelsus, an injectable prescription medication for weight loss, and alleges as follows:

## PARTIES

1. At all relevant times hereto, Plaintiff RONALD BEAR was a resident and citizen of the state of Tennessee in the county of McMinn.

2. Plaintiff was prescribed and took Rybelsus as directed by his physicians.

3. As a result of his use of Rybelsus, Mr. Bear experienced vision loss secondary to the development of non-arteritic anterior ischemic optic neuropathy (NAION) and suffers severe physical and emotional injuries and radical changes to his lifestyle given his loss of sight.

4. Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its

principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

5. Defendant Novo Nordisk Inc. is wholly owned by Defendant Novo Nordisk US Commercial Holdings, Inc.

6. Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsvaerd, Denmark.

7. Defendant Novo Nordisk A/S and its subsidiaries and affiliated named herein are collectively referred to as "the Novo Nordisk Defendants" and "Novo Nordisk".

8. The Novo Nordisk Defendants' website states that "the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill-finish site. Upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, North Carolina, operated by Novo Nordisk Pharmaceutical Industries LP.

9. Upon information and belief, Defendants failed to warn physicians and the end users of Rybelsus of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

10. Upon information and belief, Defendants failed to warn the end users of Rybelsus of the complications and devastating effects of which the company knew or should have known.

11. Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with the use of Rybelsus, risks which the companies knew or should have known.

**JURISDICTION**

12. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter

in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of Nevada and each Defendant is neither incorporated nor has its principal place of business in the State of Nevada.

13. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

## BACKGROUND

### I. The Development of Ozempic

14. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[1]

15. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

16. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2025)
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Sept. 17, 2025)
[3] *Id.*
[4] *Id.*

17. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

18. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

19. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

20. Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

21. After clinical trials, in 2014, the FDA approved liraglutide as a daily injectable for treatment of obesity under Novo Nordisk's brand name, Saxenda.[10]

22. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

---

[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2025).
[6] *Id.*
[7] *Id.*
[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2957743/#:~:text=The%20incretin%20mimetic%20liraglutide%20(Victoza,adults%20with%20type%2D2%20diabetes.&text=Liraglutide%20is%20also%20approved%20in%20Europe%20and%20Japan (last visited Sept. 18, 2025).
[9] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2025).
[10] *Id.*
[11] *Id.*

23. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

24. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, the Novo Nordisk Defendant announced submission of Ozempic's new drug application (NDA) to the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes. In the announcement, Defendant represented that in clinical trials "once-weekly" Ozempic had a safe and well-tolerated profile, and Defendant represented that the most common adverse event was nausea.[13]

25. On December 5, 2017, the FDA approved the Ozempic application and granted premarket approval as NDA 209637.[14]

26. When Novo Nordisk announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription for up to two years."

27. In addition to diabetic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[15]

---

[12] *Id.*
[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Sept. 17, 2025).
[14] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Sept. 17, 2025).
[15] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2025).

28. Just one year after Ozempic's approval for diabetes, Defendant started a clinical trial in patients who were overweight or suffered from obesity.[16]

29. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg of semaglutide, once weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[17]

30. On March 20, 2019, Defendant submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[18] On January 16, 2020, the FDA approved this new indication.[19]

31. By March of 2021, Defendant had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.[20]

32. In addition to the results, the published study, which was funded by Defendant, argued: "Obesity is a chronic disease and global public health challenge."[21]

33. Then, on May 28, 2021, Defendant submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[22]

---

[16] *Id*.
[17] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2025)
[18] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on Sept. 17, 2025).
[19] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Sept. 17, 2025).
[20] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2025)
[21] *Id*.
[22] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited Sept. 17, 2025).

34. In its press release, Defendant represented Ozempic as having "proven safety and efficacy" and Defendant continued to advertise that "it can help many patients lose some weight."[23] As with its prior press releases, Defendant disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks. Nor was there any disclosure about risks of vision loss, including NAION.

35. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

36. The new label listed ileus as an adverse reaction reported during post-approval use of semaglutide, the active ingredient in Ozempic.[24]

37. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

38. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

39. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.[25]

[23] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Sept. 17, 2025).
[24] Ozempic Label (dated 9/22/23), available at https://www.accessdata.fda.gov/drugsatfda__docs/label/2023/209637s0202s0211bl.pdf
[25] FDA Supplement Approval Letter for NDA 209637/S-032 (Ozempic), available at https://www.accessdatafda.gov/drugsatfda__docs/appletter/2024/209637Orig1s)32ltr.pdf

40. No version of the Ozempic label has warned patients or their doctors that taking Ozempic may cause NAION or result in permanent vision loss.

## II. Defendant Creates a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller

41. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[26] but before Ozempic ever received separate approval for treatment of wight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic




commercials.[27]

42. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 14 pounds" when taking Ozempic.[28]

---

[26] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 18, 2025).
[27] *Id.*
[28] *Id.*

43. Over the next five years, Novo Nordisk spent $884,000,000 running television ads in the United States to promote its semaglutides, Ozempic, Wegovy, and its lesser known GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[29]

44. Defendant also employed sophisticated use of social media to market Ozempic.

45. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[30] and currently has over 1.2 billion views.[31]

46. The hashtag #ozempicjourney has 199.5 million views, as of September 9, 2023, on TikTok.

47. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[32] This was a lauded result presented in a case study by Meta.

48. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[33]

49. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic last year.[34] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending

[29] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Sept. 18, 2023).
[30] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited Sept. 18, 2025).
[31] https://www.tiktok.com/tag/ozempic (last visited on August 1, 2023).
[32] https://business.instagram.com/success/novo-nordisk (last visited Sept. 17, 2025).
[33] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on Sept. 17, 2025).
[34] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Sept. 17, 2025).

data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[35]

50. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[36]

51. Jimmy Kimmel joked about Ozempic at the Oscars.[37]

52. Howard Stern has joked and discussed Ozempic.[38] Interestingly, Stern notes that the "catchy" theme song "distracts" the listener from actually hearing any of the listed side effects.[39]

53. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

54. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [40]

55. In sum, Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

56. However, throughout its marketing, Defendant failed to disclose the true serious side effects of Ozempic, including but not limited to hospitalization and death.

## III. Marketing Works: Novo Nordisk's Rampant Promotion Result in Thousands of Prescriptions and Billions in Sales

[35] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390
[36] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/
[37] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/11428801002/ (last accessed Sept. 17, 2025).
[38] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited on Sept. 17, 2025).
[39] *Id.*
[40] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 18, 2025)

57. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

58. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[41]

59. In July of 2021, doctors in the US wrote 62,000 prescriptions a week for Ozempic.[42]

60. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[43]

61. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[44]

62. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[45]

63. Ozempic has become so popular, Novo Nordisk has recently limited shipment to the US and paused advertising while it addresses shortages.[46]

## IV. Defendant has long known that Ozempic is a powerful, dangerous drugs.

[41] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html#:~:text=Novo%20traded%20earnings%20jabs%20with,to%20more%20than%20%243.7%20billion. (last visited Sept. 18, 2025).

[42] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited on Sept. 18, 2025).

[43] *Id.*

[44] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on 8/1/25).

[45] https://www.nytimes.com/2023/08/28/business/denmark-ozempic-wegovy.html?action=click&pgtype=Article&state=default&module=styln-weight-loss-drugs&variant=show&region=MAIN_CONTENT_1&block=storyline_top_links_recirc (last visited on Sept. 18, 2025).

[46] https://www.theatlantic.com/health/archive/2023/05/ozempic-teen-obesity-treatment-health-promises-risks/674204/ (last visited on Sept. 18, 2025).

64. As detailed below, Defendant knew from both pre-market and post-market research and analytics that Ozempic could cause malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration.

65. Novo Nordisk has repeatedly failed to warn about the known dangerous side effects of Ozempic. This includes malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration. All of these conditions can, and have, lead to hospitalization and/or death in patients across America.

66. Some doctors estimate that as many as 10% of patients discontinue use of these drugs due to the severity of side effects.[47]

67. Thousands of adverse event reports have been filed by the public with the FDA Adverse Event Reporting System. As of June 2022, the FDA has posted an alert that Ozempic has potential safety signals for intestinal blockage.[48]

68. On September 22, 2023, FDA updated the label for Ozempic to include "ileus," the medical term for blocked intestines.[49]

---

[47] https://www.cbsnews.com/news/ozempic-side-effects-weight-loss-drugs-wegovy-mounjaro-doctors-warn/ (last visited Sept. 18, 2025)

[48] https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/april-june-2022-potential-signals-serious-risksnew-safety-information-identified-fda-adverse-event (last visited Sept. 18, 2025)

[49] https://www.accessdata.fda.gov/scripts/cder/safetylabelingchanges/index.cfm?event=searchdetail.page&DrugNameID=2183; https://www.healthline.com/health-news/fda-updates-ozempic-label-to-include-blocked-intestines-as-potential-side-effect#:~:text=Ozempic%20Label%20Updated%20to%20Include%20Blocked%20Intestines%20as%20Potential%20Side%20Effect&text=The%20FDA%20is%20warning%20patients,serious%20and%20potentially%20fatal%20condition.

69. Wegovy, chemically identical to Ozempic, already carried a warning on ileus.

70. As early as 2014, Defendant knew that Saxenda (liraglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.[50]

**V. FDA's Approval of Rybelsus**

71. On March 20, 2019, the Novo Nordisk Defendants announced the submission of a new drug application (NDA) to the FDA for regulatory approval for oral semaglutide, under the brand name Rybelsus, the first once-daily glucagon-like peptide-1 receptor agonist for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes.[51]

72. On March 20, 2019, Defendant Novo Nordisk Inc. submitted NDA 213051, requesting that the FDA grant it approval to market and sell Rybelsus (oral semaglutide) in both 7 mg and 14 mg oral doses in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.[52] On September 20, 2019, the FDA approved NDA 213051.[53]

73. On December 10, 2019, Defendant Novo Nordisk Inc. submitted a supplemental new drug application (NDA 213051/S-001) for Rybelsus (semaglutide) asking "for the addition of efficacy and safety information to the prescribing information based on clinical data from the

[50] https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206321orig1s000lbl.pdf (last visited on Sept. 18, 2025).

[51] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes,* Cision PR Newswire (Mar. 20, 2019), available at https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on 9/20/23).

[52] Clinical Review for NDA 213051 (Rybelsus), available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/213051Orig1s000MedR.pdf (last visited on 9/22/23).

[53] FDA Approval Letter for NDA 213051 (Rybelsus), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/213051Orig1s000ltr.pdf (last visited on 9/20/23).

PIONEER 6 cardiovascular outcomes trial entitled, 'A trial investigating the cardiovascular safety of oral semaglutide in subjects with type 2 diabetes.'"[54] On January 16, 2020, the FDA approved NDA 213051/S-001.[55]

74. On March 28, 2022, the FDA notified Defendant Novo Nordisk, Inc. of new safety information that it determined should be included in the labeling for GLP-1RA products pertaining to the risk of acute gallbladder disease. On April 27, 2022, Defendant Novo Nordisk, Inc. submitted a supplemental new drug application (NDA 213051/S-011) and amendments for Rybelsus (semaglutide) tablets incorporating the FDA's required safety modifications to the label. On June 10, 2022, the FDA provided supplemental approval for NDA 213051/S-011.[56]

75. On July 15, 2022, Defendant Novo Nordisk Inc. submitted a supplemental new drug application (NDA 123051/S-012) for Rybelsus to remove the "Limitation of Use" statement "Not recommended as first-line therapy for patients inadequately controlled on diet and exercise" in the "Prescribing Information and Medication Guide" ("PI"). The following updates were also made to the PI information: a) addition of Pancreatitis and Diabetic Retinopathy Complications to the Other Adverse Reactions subsection in section 6.1, Clinical Trials Experience; b) updating the Immunogenicity section and moving it from section 6.2 to section 12.6; c) adding "Gastrointestinal: ileus" to section 6.2, Postmarketing Experience; d) revising section 7.1, Concomitant Use with an Insulin Secretagogue (e.g., Sulfonylurea) or with insulin; and e) other

---

[54] FDA Approval Letter available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2020/213182Orig1s000Approv.pdf (last visited on 9/22/23).
[55] FDA Approval Letter for NDA 213051/S-001 (Rybelsus), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/213182Orig1s000,%20213051Orig1s001ltr.pdf (last visited on 9/21/23).
[56] FDA Approval Letter for NDA 123051/S-011 (Rybelsus) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/213051Orig1s011ltr.pdf (last visited on 9/20/23).

minor grammatical changes. The FDA approved NDA 123051/S-012 on January 12, 2023.[57]

76. On January 12, 2023, the Novo Nordisk Defendants announced the FDA's approval of NDA 123051/S-012 for the label update described above. In the press release, the Novo Nordisk Defendants emphasized that "Rybelsus has been prescribed to hundreds of thousands of patients to help improve glycemic control[,]" and they disclosed Important Safety Information about Rybelsus and provided links to its Medication Guide and Prescribing Information, but NAION was not identified as a side effect or risk.[58]

## VI. Novo Nordisk's Marketing and Promotion of Rybelsus

77. The Novo Nordisk Defendants promoted the safety and sale of Rybelsus in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

78. On September 22, 2020, the Novo Nordisk Defendants launched their first television ad for Rybelsus featuring an upbeat cover version of "You Are My Sunshine" by Simon Ravenhall. In the ad, the Novo Nordisk Defendants advertised that "people taking Rybelsus lost up to 8 pounds", even though it is not a weight loss drug.[59] Also, the Novo Nordisk Defendants identified only one "serious side effect" of taking Rybelsus in the ad, pancreatitis.

---

[57] *Novo Nordisk announces FDA approval of label update for Rybelsus® (semaglutide) allowing use as a first-line option for adults with type 2 diabetes,* Cision PR Newswire (Jan. 12, 2023), available at https://www.prnewswire.com/news-releases/novo-nordisk-announces-fda-approval-of-label-update-for-rybelsus-semaglutide-allowing-use-as-a-first-line-option-for-adults-with-type-2-diabetes-301720965.html (last visited on 9/20/23).
[58] Novo Nordisk, *Novo Nordisk announces FDA approval of label update for Rybelsus® (semaglutide) allowing use as a first-line option for adults with type 2 diabetes* (Jan. 12, 2023), available at https://www.novonordisk-us.com/media/news-archive/news-details.html?id=154651 (last visited on 9/21/23).
[59] *Ozempic TV Spot,* "Wake Up", iSpot.tv (September 2020), available at https://www.ispot.tv/ad/nvgx/rybelsus-wake-up (last visited on 9/20/23).

79. From 2018 until present, the Novo Nordisk Defendants have spent $884,000,000 on running television ads in the United States to promote their semaglutide drugs (Ozempic, Wegovy and Rybelsus).[60]

80. In 2021, the Novo Nordisk Defendants spent $307.6 million on Rybelsus ads, making it the No. 2 top spender that year.[61] In 2022, the Novo Nordisk Defendants spent $167.2 million on Rybelsus advertisements, making it the No. 7 top spender last year.[62] In 2022, the Novo Nordisk Defendants spent an estimated $123.9 million on Rybelsus television ads alone.[63] More than 60% of the Novo Nordisk Defendants' television advertisement budget was for a single ad "Down With Rybelsus" that sought to make the case for switching from other GLP-1RA's to Rybelsus.[64] The commercial featured an actor playing a physician with a voice-over stating that Rybelsus lowered A1C better than "a leading branded pill", referring to Merck & Co.'s diabetes drug, Januvia.[65] The television ad identified only one "serious side effect" of taking Rybelsus, pancreatitis.[66] As a result of its GLP-1RA treatments, including Rybelsus, the Novo Nordisk Defendants forecast sales growth of 13% to 19% for 2023.[67]

81. On July 5, 2023, it was reported that the Novo Nordisk Defendants had spent $11,000,000 on food and travel for doctors as part of their efforts to promote their GLP-1 medications, including Rybelsus. In 2022 alone, the Novo Nordisk Defendants bought more than

---

[60] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023), available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited on 9/20/23).
[61] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (last visited on 9/20/23).
[62] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (last visited on 9/20/23).
[63] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (last visited on 9/20/23).
[64] *Down With RYBELSUS*, https://www.ispot.tv/ad/btuw/rybelsus-down-with-rybelsus (last visited on 9/20/23).
[65] *Down With RYBELSUS*, https://www.ispot.tv/ad/btuw/rybelsus-down-with-rybelsus (last visited on 9/20/23).
[66] *Down With RYBELSUS*, https://www.ispot.tv/ad/btuw/rybelsus-down-with-rybelsus (last visited on 9/20/23).
[67] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (last visited on 9/20/23).

457,000 meals to educate doctors and other prescribers about its GLP-1, with nearly 12,000 doctors receiving more than 50 meals and snacks from the Novo Nordisk Defendants. In 2022, the Novo Nordisk Defendants also spent $2 million flying doctors to London, Paris, Orlando, and Honolulu related to its GLP-1s.[68]

82. On July 21, 2023, it was reported that Novo Nordisk had purchased more than 457,000 meals—at a total price of more than $9 million—to educate prescribers about its GLP-1s. The president and CEO of the Alliance of Community, who was interviewed for the article, described the expenditures as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about their potential side effects and long-term effectiveness. The author pointed out that research published in spring 2023 "suggested that GLP-1s could put patients at an elevated risk of a potentially fatal gastrointestinal condition that requires surgery."[69]

83. As a result of the Novo Nordisk Defendants' advertising and promotion efforts, Rybelsus has been widely used throughout the United States. In its inaugural year alone, Rybelsus "defied full-year sales expectations in 2020" topping $350 million. Over 80% of these Rybelsus prescriptions were from patients new to the GLP-1RA class, not significantly dipping into the Novo Nordisk Defendants' already strong market position with Ozempic.[70]

84. On TikTok, there are currently over 54.5M views on #rybelsus-review, 46 million

---

[68] Florko, N, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic,* National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic (last visited on 9/20/23).

[69] Erin Prater*, Ozempic manufacturer Novo Nordisk spent $11 million last year 'wining and dining' doctors. Experts slam the move as a breach of doctor-patient trust,* Fortune Well (July 21, 2023), available at https://fortune.com/well/2023/07/21/ozempic-novo-nordisk-meals-travel-prescribing-doctors/ (last visited on 9/19/23).

[70] *Novo Nordisk's Rybelsus launch defied 2020 full-year sales expectations, despite the economic impacts of the Covid-19 pandemic*, Pharmaceutical Technology (February 12, 2001), available at https://www.pharmaceutical-technology.com/comment/novo-nordisk-rybelsus-launch-sales (last visited on 9/20/23).

views on #rybelsus, and 44.1M views on #rybelsus-experience.[71]

85. On June 15, 2023, NBC News published a report about the thousands of weight loss advertisements on social media for Defendants' drugs, including Rybelsus. While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023 the Novo Nordisk Defendants were still running online social-media ads for their semaglutide products, despite claiming in May that they would stop running ads due to a shortage of the drug.[72]

86. On June 25, 2023, NBC News reported that the Novo Nordisk Defendants anticipate filing for FDA approval for Rybelsus for weight loss in people who are obese or overweight, and do not have type 2 diabetes. ADA chief scientist, Dr. Robert Gabbay, called the development "a game changer."[73]

87. At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Rybelsus.

## VII. Development of NAION and Its Sequela

88. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

89. NAION is irreversible and permanent.

90. NAION falls within the category of an eye stroke.

91. NAION is untreatable and can lead to permanent blindness.

---

[71] https://www.tiktok.com/discover/rybelsus-review; https://www.tiktok.com/discover/rybelsus; https://www.tiktok.com/discover/rybelsus-experience (last visited on 9/22/23).

[72] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023), available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited on 9/19/23).

[73] Lovelace, B, *Effective pills for weight loss, including an oral version of Ozempic, are on the horizon,* NBC News (June 25, 2023), available at https://www.nbcnews.com/health/health-news/effective-pills-weight-loss-oral-version-ozempic-are-horizon-rcna90981 (last visited on 9/20/23).

92. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

93. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."

94. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.

95. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

96. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

97. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

98. Some NAION patients lose complete vision with no recovery in affected eye(s).

99. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

100. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[74]

101. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[75]

102. GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

103. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[76]

104. Defendant knew or should have known of the causal association between the use of Ozempic and Rybelsus and the risk of developing NAION and its sequelae, but they ignored it.

105. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

106. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[77]

---

[74] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy

[75] *Id.*

[76] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

[77] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

107. A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[78]

108. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[79]

109. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.[80]

110. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[81]

111. Defendant knew or should have known of the risk of NAION with use of Ozempic and Rybelsus.

---

[78] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

[79] Id.

[80] Id.

[81] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (December 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited 12/18/2024); See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (December 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited 12/18/2024).

112. Defendant conducts clinical trials and has access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

113. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[82]

114. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[83]

115. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

116. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway *et al.*, involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[84]

---

[82] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.

[83] *Id.*

[84] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

117. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[85]

118. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[86]

119. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[87]

120. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[88]

121. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*

and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[89]

122. Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[90]

123. A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendant's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[91] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[92] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[93]

124. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[94]

---

[89] *Id.*
[90] *Id.*
[91] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[92] *Id.*
[93] *Id.*
[94] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

125. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[95] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[96]

126. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[97] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[98]

127. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[99]

128. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[100]

129. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[101]

---

[95] *Id.*
[96] *Id.*
[97] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*

130. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[102]

131. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[103]

132. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[104]

133. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[105]

134. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[106]

---

[102]https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/
[103]https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness
[104] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[105] *Id.*
[106] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

135. Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic or Rybelsus.

**VIII. Defendant's Continuing Failure to Disclose the Risk of NAION and its Sequala**

136. On June 6, 2025 the European Medicines Agency (EMA) recommended that the product information for semaglutide medicines including Ozempic/Wegovy/Rybelsus include NAION as a side effect.[107]

137. To date, the Ozempic warning label is still devoid of any mention of NAION.

138. To date, the Wegovy warning label is still devoid of any mention of NAION.

139. To date, the Rybelsus warning label is still devoid of any mention of NAION

140. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic/Wegovy/Rybelsus, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

141. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

142. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic/Wegovy/Rybelsus labels without any prior FDA approval.

[107] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy

143. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

144. On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[108]

145. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[109]

---

[108] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

[109] *Id.*

146. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[110]

**PARTY PLAINTIFF**

147. Plaintiff RONALD BEAR is a resident of the state of Tennessee and is currently 59 years old.

148. Upon information and belief, Plaintiff was prescribed Rybelsus and used Rybelsus in June-July of 2023.

149. Within approximately 30 days of beginning use of Rybelsus, Plaintiff experienced sudden blurred vision. Following medical work up and testing, he was formally diagnosed with NAION in October 2023.

150. As a result of Defendant's actions and inactions, Plaintiff suffers from severe vision loss, which impacts his activities of daily living, including his ability to work. He seeks damages associated with these injuries.

151. Mr. Bear suffered a significant loss of visual acuity.

152. His eyesight loss is permanent.

153. At all times material to the above, the Rybelsus label failed to adequately warn Mr. Bear and his medical providers of the true risks of taking Rybelsus.

154. At all times material to the above, the marketing and advertising failed to adequately warn Mr. Bear and his medical providers of the true risks of taking Rybelsus.

---

[110] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

155. His life is forever changed because of his usage of Rybelsus.

156. Mr. Bear will never see clearly again as a result of his usage of Rybelsus.

157. Defendant knew or should have known that use of semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

158. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

159. Defendant's Rybelsus was at all times utilized and prescribed in a manner foreseeable to Defendant.

160. Plaintiff used Rybelsus, and did not misuse, or alter Rybelsus in an unforeseeable manner.

161. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

162. As a result of Defendant's actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

163. As a direct result of being prescribed and using Rybelsus, Plaintiff has been permanently and severely injured, having suffered serious consequences.

164. As a direct and proximate result of his Rybelsus use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

165. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Rybelsus was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

166. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Rybelsus, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of his weight loss.

167. Plaintiff's life is forever changed as a result of Defendant's actions and inactions.

**FIRST CAUSE OF ACTION**
**(NEGLIGENT FAILURE TO WARN - TENN. CODE ANN. § 29-28-102(6) AGAINST ALL DEFENDANTS)**

168. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169. The Tennessee Products Liability Act ("TPLA") contains, in relevant part, the following definitions:

> (4) "Manufacturer" means the designer, fabricator, producer, compounder, processor or assembler of any products or its component parts;
>
> (5) "Product" means any tangible object or goods produced;
>
> (6) "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict

> liability in tort; negligence; breach of warranty, express or implied; breach of failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever;
>
> (8) “Unreasonably dangerous” means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. §29-28-102.

170. The unsafe and defective Rybelsus is “a product.” Tenn. Code Ann. § 29-28-102(5).

171. Defendants are “manufacturer[s].” Tenn. Code Ann. § 29-28-102(4).

172. Tennessee law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

173. At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Rybelsus that were used by Plaintiff.

174. Rybelsus was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

175. At all relevant times, and at the times Rybelsus left Defendants’ control,

Defendants knew or should have known that Rybelsus was unreasonably dangerous because it did not adequately warn of the risk of NAION especially when used in the form and manner as provided by Defendants.

176. Despite the fact that Defendants knew or should have known that Rybelsus caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Rybelsus to consumers, including Plaintiff, without adequate warnings.

177. Despite the fact that Defendants knew or should have known that Rybelsus caused unreasonably dangerous injuries, Defendants continued to market Rybelsus to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

178. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

179. At all relevant times, given its increased safety risks, Rybelsus was not fit for the ordinary purpose for which it was intended.

180. At all relevant times, given its increased safety risks, Rybelsus did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

181. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Rybelsus into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION.

182. At all relevant times, Plaintiff was using Rybelsus for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

183. The Rybelsus designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including NAION, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

184. The Rybelsus designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post- marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including NAION as well as other severe and permanent health consequences from Rybelsus, they failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote their products, Rybelsus.

185. The labels for Rybelsus were inadequate because they did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Rybelsus, including NAION.

186. The labels for Rybelsus were inadequate because they did not warn and/or adequately warn that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION.

187. The labels for Rybelsus were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Rybelsus.

188. The labels for Rybelsus were inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

189. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Rybelsus, including the increased risk of NAION.

190. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION.

191. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

192. Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

193. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of NAION which are causally associated with Rybelsus, then the prescribing physician would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the dangers of Rybelsus, so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

194. Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION the prescribing physician would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Rybelsus, so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

195. If Plaintiff had been warned of the increased risks of NAION which are causally associated with Rybelsus, then Plaintiff would not have used Rybelsus and/or suffered from NAION.

196. If Plaintiff had been warned that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, then Plaintiff would not have used Rybelsus and/or suffered from NAION.

197. If Plaintiff had been warned of the increased risks NAION, which are causally associated with Rybelsus, then Plaintiff would have informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Rybelsus.

198. Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Rybelsus due to the risks of NAION, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Rybelsus.

199. By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Rybelsus.

200. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

201. Defendants' inadequate warnings for Rybelsus were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

202. Said inadequate warnings for Defendants' drug Rybelsus were a substantial factor

in causing Plaintiff's injuries.

203. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including NAION, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

204. As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**SECOND CAUSE OF ACTION**
**(STRICT LIABILITY - FAILURE TO WARN - TENN. CODE ANN. § 29-28-102(6) AGAINST ALL DEFENDANTS)**

205. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

206. Tennessee law imposes a duty on manufacturers of prescription drugs to market to minimize the risk of danger when producing, manufacturing, distributing, leasing, and selling their products

207. At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Rybelsus that was used by Plaintiff.

208. Rybelsus was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was

produced, manufactured, sold, distributed, and marketed by Defendants.

209. At all relevant times, and at the times Rybelsus left Defendants' control, Defendants knew or should have known that Rybelsus was unreasonably dangerous because it did not adequately warn of the risk of NAION, especially when used in the form and manner as provided by Defendants.

210. Despite the fact that Defendants knew or should have known that Rybelsus caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Rybelsus to consumers, including Plaintiff, without adequate warnings.

211. Despite the fact that Defendants knew or should have known that Rybelsus caused unreasonably dangerous injuries, Defendants continued to market Rybelsus to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

212. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

213. At all relevant times, given their increased safety risks, Rybelsus was not fit for the ordinary purpose for which they were intended.

214. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Rybelsus into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION, and a duty to adequately warn Plaintiff of potentially dangerous side effects.

215. At all relevant times, Plaintiff was using Rybelsus for the purposes and in a manner normally intended.

216. At all relevant times, there existed unequal knowledge between the Defendants and the Plaintiff regarding the risk of Rybelsus.

217. The Rybelsus designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including NAION, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

218. The Rybelsus designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including NAION, as well as other severe and permanent health consequences from Rybelsus, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their product, Rybelsus.

219. The label for Rybelsus was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Rybelsus, including NAION.

220. The label for Rybelsus was inadequate because it did not warn and/or adequately warn that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION.

221. The labels for Rybelsus was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Rybelsus.

222. The labels for Rybelsus was inadequate because it did not warn and/or adequately

warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

223. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Rybelsus, including NAION.

224. Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION.

225. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

226. Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

227. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of NAION, which are causally associated with Rybelsus, then the prescribing physician(s) would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the dangers of Rybelsus so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

228. Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, the prescribing physician(s) would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Rybelsus so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of

Rybelsus.

229. If Plaintiff had been warned of the increased risks of NAION, which are causally associated with Rybelsus, then Plaintiff would not have used Rybelsus and/or suffered from NAION.

230. If Plaintiff had been warned that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, then Plaintiff would not have used Rybelsus and/or suffered NAION.

231. If Plaintiff had been warned of the increased risks of NAION, which is causally associated with Rybelsus, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Rybelsus.

232. Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Rybelsus due to the risks of NAION, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Rybelsus.

233. By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous product, Rybelsus.

234. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

235. Defendants' inadequate warnings for Rybelsus were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

236. Said inadequate warnings for Defendants' drugs Rybelsus were a substantial factor in causing Plaintiff's injuries.

237. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including NAION, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

238. As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## THIRD CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY - TENN. CODE ANN. § 29-28-102(6) AGAINST ALL DEFENDANTS)

239. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

240. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Rybelsus that was used by Plaintiff.

241. At all relevant times, Defendants expressly warranted to Plaintiff and Plaintiff's prescribing physician(s) that Rybelsus was safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

242. The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician(s) by way of Rybelsus's labels, websites, advertisements, promotional

materials, and through other statements.

243. As a result of Defendants' express warranties, Plaintiff's prescribing physician was induced to prescribe Rybelsus to Plaintiff, and Plaintiff was induced to use Rybelsus.

244. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Rybelsus based upon their express warranties.

245. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Rybelsus based upon their express warranties.

246. At all relevant times, Defendants knew or should have known that Rybelsus was unreasonably dangerous because of its increased risk of NAION, especially when the drug was used in the form and manner as provided by Defendants.

247. At all relevant times, Defendants knew or should have known that Rybelsus had not been sufficiently and/or adequately tested for safety.

248. The unreasonably dangerous characteristics of Rybelsus were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

249. The unreasonably dangerous characteristics of Rybelsus were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

250. At the time Rybelsus left Defendants' control, Rybelsus did not conform to Defendants' express warranties because Rybelsus were not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that it was causally

associated with increased risks of NAION.

251. The express warranties made by Defendants regarding the safety of Rybelsus were made with the intent to induce Plaintiff to use the product and/or Plaintiff's prescribing physician(s) to prescribe the product.

252. Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician(s), it would be the natural tendency of Plaintiff to use Rybelsus and/or the natural tendency of Plaintiff's prescribing physician(s) to prescribe Rybelsus.

253. Plaintiff and Plaintiff's prescribing physician(s), as well as members of the medical community, relied on the express warranties of Defendants identified herein.

254. Had Defendants not made these express warranties, Plaintiff would not have used Rybelsus and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Rybelsus.

255. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

256. Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

257. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

258. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION, as well as other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or

medications, and fear of developing any of the above-named health consequences.

259. By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Rybelsus drug.

260. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**FOURTH CAUSE OF ACTION**
**(BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY-**
**UNDER TENN. CODE ANN. § 29-28-102(6)**
**AGAINST ALL DEFENDANTS)**

261. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

262. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Rybelsus that was used by Plaintiff.

263. Rybelsus was expected to and did reach the usual consumers, handlers, and persons encountering said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

264. At all relevant times, Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Rybelsus was of merchantable quality and safe and fit for its ordinary purpose.

265. At all relevant times, Defendants knew or should have known that Rybelsus was unreasonably dangerous because of the increased risk of NAION, especially when the drug was

used in the form and manner as provided by Defendants.

266. At all relevant times, Defendants knew or should have known that Rybelsus had not been sufficiently and/or adequately tested for safety.

267. At the time Rybelsus left Defendants' control, Rybelsus did not conform to Defendants' implied warranty and was unfit for its ordinary purpose because Defendants failed to provide adequate warnings of the drug's causal association with increased risk of NAION.

268. At all relevant times, Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Rybelsus for use by their patients to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk, and/or to promote weight loss.

269. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Rybelsus for their ordinary purposes.

270. Despite the fact that Defendants knew or should have known that Rybelsus causes unreasonably dangerous injuries, such as NAION, Defendants continued to market, distribute, and/or sell Rybelsus to consumers, including Plaintiff, without adequate warnings.

271. The unreasonably dangerous characteristics of Rybelsus were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

272. The unreasonably dangerous characteristics of Rybelsus were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

273. Plaintiff reasonably relied on Defendants' implied warranty of merchantability relating to Rybelsus's safety and efficacy.

274. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Rybelsus was of merchantable quality and safe and fit for their intended use.

275. Upon information and belief, Plaintiff's prescribing physician(s) relied on Defendants' implied warranty of merchantability and fitness for the ordinary use and purpose relating to Rybelsus.

276. Upon information and belief, Plaintiff's prescribing physician(s) reasonably relied upon the skill and judgment of Defendants as to whether Rybelsus was of merchantable quality and safe and fit for their intended uses.

277. Had Defendants not made these implied warranties, Plaintiff would not have used Rybelsus and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Rybelsus, and/or would have altered his/her/their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Rybelsus to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

278. Defendants herein breached the aforesaid implied warranty of merchantability because the drug Rybelsus were not fit for its intended purposes.

279. Defendants' breaches of implied warranty of merchantability were a substantial factor in causing Plaintiff's injuries.

280. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

281. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require

more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**FIFTH CAUSE OF ACTION**
**(FRAUDULENT CONCEALMENT - TENN. CODE ANN. § 29-28-102(6) AGAINST ALL DEFENDANTS)**

282. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

283. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Rybelsus that was used by Plaintiff.

284. At all relevant times, Defendants knew or should have known that Rybelsus had not been adequately and/or sufficiently tested for safety.

285. At all relevant times, Defendants knew or should have known that Rybelsus was unreasonably dangerous because of the increased risk of NAION, especially when the drug was used in the form and manner as provided by Defendants.

286. Defendants had a duty to disclose material information about Rybelsus to Plaintiff and Plaintiff's prescribing physician(s), namely that Rybelsus is causally associated with increased risk of NAION, because Defendants have superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician(s) would act on the basis of mistaken knowledge.

287. Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the

general public this material information.

288. Defendants' promotional websites for Rybelsus similarly do not disclose that Rybelsus is causally associated with increased risk of NAION.

289. Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Rybelsus for treatment of Type 2 Diabetes.

290. Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe, and Plaintiff would use Rybelsus without the awareness of the risks of serious side effects, including NAION.

291. Defendants knew that Plaintiff and Plaintiff's prescribing physicians(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Rybelsus, as set forth herein.

292. Upon information and belief, Plaintiffs prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Rybelsus.

293. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION, they would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate information regarding the increased risk of NAION causally associated with Rybelsus to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

294. Upon information and belief, had Plaintiff's prescribing physician(s) been told that

Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, they would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Rybelsus to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

295. Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Rybelsus.

296. Had Plaintiff been informed of the increased risks causally associated with Rybelsus, Plaintiff would not have used Rybelsus and/or suffered his NAION injury.

297. Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

298. As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including NAION, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

299. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SIXTH CAUSE OF ACTION
## (INTENTIONAL MISREPRESENTATION- TENN. CODE ANN. § 29-28-102(6) AGAINST ALL DEFENDANTS)

300. Plaintiff repeats, reiterates, and realleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

301. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Rybelsus that was used by Plaintiff.

302. At all relevant times, Defendants knew or should have known that Rybelsus had not been adequately and/or sufficiently tested for safety.

303. At all relevant times, Defendants knew or should have known of the serious side effects of Rybelsus, including NAION.

304. At all relevant times, Defendants knew or should have known that Rybelsus was not safe to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk in patients with type 2 diabetes, or promote weight loss, given its increased risk of NAION.

305. Nonetheless, Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Rybelsus.

306. Defendants represented affirmatively and by omission in advertisements and on the labels of Rybelsus that Rybelsus were safe and effective drugs for treatment of adults with Type 2 diabetes, despite being aware of increased risks of NAION causally associated with using Rybelsus.

307. Defendants were aware or should have been aware that its representations were false or misleading and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

308. Defendants' misrepresentations of material facts were made purposefully,

willfully, wantonly, and/or recklessly, in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Rybelsus for treatment of Type 2 Diabetes.

309. Upon information and belief, Plaintiff's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Rybelsus, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff's prescribing physician(s) had no way to know were omitted.

310. Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Rybelsus to Plaintiff.

311. Upon information and belief, had Plaintiff's prescribing physician(s) been informed of the increased risk of NAION causally associated with Rybelsus, Plaintiff's prescribing physician(s) would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate information regarding safety of Rybelsus to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

312. Upon information and belief, had Plaintiff's prescribing physician(s) been told that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, they would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Rybelsus so that Plaintiff can make an informed decision regarding Plaintiff's use of Rybelsus.

313. Plaintiff had no way to determine the truth behind Defendants' false and/or

misleading statements, concealments and omissions surrounding Rybelsus, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff had no way to know were omitted.

314. Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to accept, purchase and/or consume Rybelsus.

315. Had Plaintiff been told of the increased risk NAION, Plaintiff would not have used Rybelsus and/or suffered his NAION injury.

316. Had Plaintiff been told of the lack of sufficient and/or appropriate testing of Rybelsus for safety risks, including NAION, Plaintiff would not have used Rybelsus and/or suffered his NAION injury.

317. As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including NAION, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

318. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**SEVENTH CAUSE OF ACTION**
**(NEGLIGENT/INNOCENT MISREPRESENTATION-**
**TENN. CODE ANN. § 29-28-102(6)**
**AGAINST ALL DEFENDANTS)**

319. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

320. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Rybelsus that was used by Plaintiff.

321. At all relevant times, Defendants knew or should have known that Rybelsus had not been adequately and/or sufficiently tested for safety.

322. At all relevant times, Defendants knew or should have known of the serious side effects of Rybelsus, including NAION.

323. Defendants had a duty to disclose material information about Rybelsus to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public that Rybelsus is causally associated with increased risk of NAION, because Defendants held a special expertise with respect to Rybelsus; Plaintiff and other Rybelsus users had a special relationship of trust with Defendants; and Defendants knew that their statements regarding the risks causally associated with Rybelsus would be relied on by Rybelsus users.

324. At all relevant times, Defendants knew or should have known of the serious side effects of Rybelsus, NAION.

325. Nonetheless, Defendants made material misrepresentations and omissions and/or concealments to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public regarding the safety and/or efficacy of Rybelsus.

326. Defendants represented affirmatively and by omission in advertisements and on the

labels of Rybelsus that Rybelsus were safe and effective drugs for treatment of adults with Type 2 diabetes, despite being aware of the increased risks of NAION causally associated with using Rybelsus.

327. Defendants were aware or should have been aware that their representations were false or misleading and/or knew that Defendants were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

328. Defendants knew that Plaintiff and Plaintiff's prescribing physicians(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Rybelsus, as set forth herein.

329. Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Rybelsus to Plaintiff.

330. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION, they would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate information regarding safety of Rybelsus so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Rybelsus.

331. Upon information and belief, had Plaintiff's prescribing physician(s) been told that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION, they would not have prescribed Rybelsus and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Rybelsus so that Plaintiff can make an informed decision regarding Plaintiff's use of Rybelsus.

332. Plaintiff reasonably relied on the false and/or misleading facts and information

disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff had no way to know were omitted.

333. Had Plaintiff been told of the increased risk of NAION causally associated with Rybelsus, Plaintiff would not have used Rybelsus and/or suffered his NAION injury.

334. Defendants' misrepresentations and omissions of material facts amount to willful, wanton, and/or reckless conduct.

335. As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer pecuniary harm in addition to the above-described personal injuries Plaintiff suffered.

336. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

337. Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

338. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and

deter future similar conduct;

339. Awarding Plaintiff the costs of these proceedings; and

340. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated: September 25, 2026

RESPECTFULLY SUBMITTED,

*/s/ W. Cameron Stephenson*

W. Cameron Stephenson
Levin, Papantonio, Proctor, Buchanan,
O'Brien, Barr & Mougey, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502

*Attorney for Plaintiff*